Dillon Hagius (SBN 319632)
Richard W. Gonnello (*pro hac vice* forthcoming)
Katherine M. Lenahan (*pro hac vice* forthcoming)
**FARUQI & FARUQI, LLP**
685 Third Avenue, 26th Floor
New York, NY 10017
Telephone: 212-983-9330
Facsimile: 212-983-9331
Email: dhagius@faruqilaw.com
        rgonnello@faruqilaw.com
        klenahan@faruqilaw.com

*Attorneys for Plaintiff Ronald G. Bishop, Sr.*

### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RONALD G. BISHOP, SR., Individually and on Behalf of All Others Similarly Situated,<br><br>                                    Plaintiff,<br><br>    vs.<br><br>STITCH FIX, INC., KATRINA LAKE, PAUL YEE and MIKE C. SMITH,<br><br>                                    Defendants | Case No. 3:18-cv-07427<br><br>**CLASS ACTION**<br><br>COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>JURY TRIAL DEMANDED |

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

The allegations in this Complaint[1] are based on the personal knowledge of Plaintiff Ronald G. Bishop, Sr. ("Plaintiff"), as to Plaintiff's own acts, and are based upon information and belief as to all other matters alleged herein. Plaintiff's information and belief is based upon the substantial investigation by Plaintiff's counsel into the facts and circumstances alleged herein, based on the following: (i) a review and analysis of those public filings referenced herein that Stitch Fix, Inc. ("Stitch Fix" or the "Company") made with the United States Securities and Exchange Commission ("SEC"); (ii) a review and analysis of those press releases, analyst reports, public statements, news articles, and other publications referenced herein disseminated by or concerning Stitch Fix and the other defendants named herein (together with Stitch Fix, "Defendants"); (iii) a review and analysis of those Company conference calls, press conferences, and related statements and materials referenced herein; and (iv) review and analysis of those other documents referenced herein. Many additional facts supporting the allegations are known only to the Defendants and/or are within their exclusive custody or control. Plaintiff believes that additional evidentiary support for the allegations will emerge after a reasonable opportunity to conduct discovery.

## NATURE AND SUMMARY OF THE ACTION

1.   Subject to certain exclusions, this is a federal securities class action which seeks remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5 promulgated thereunder and is brought on behalf of a class consisting of all persons or entities who purchased publicly traded Stitch Fix common stock and/or sold put option contracts between June 8, 2018 and October 1, 2018, inclusive (the "Class Period"), and were damaged thereby.

2.   Stitch Fix is an online fashion subscription service that purchases clothing, shoes, and accessories from name-brand manufacturers and also designs and brings to market its own styles. Stitch Fix personnel then select and deliver boxes of items specially chosen for clients to try on, buy what they like, and return the rest. While some or all of the items can be returned

---

[1]   All internal citations and quotations are omitted and all emphases are added unless otherwise noted.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

free of charge, clients are incentivized to accept the entire selection through a 25% price discount that is only applied if the client accepts the entire shipment.

3.       This business model exposes Stitch Fix to a substantial risk that it will be forced to "write off" unsellable inventory.  This risk is magnified by the speed at which fashion trends change.  The Company mitigates this risk by accumulating large amounts of data about its clients' sizes, style preferences, and purchasing habits, and running that data through algorithms to match its clients' preferences.

4.       The most important business metric to investors of subscription businesses such as Stitch Fix is the number and growth rate of its "active clients."  Stitch Fix defines an "active client" as someone who has responded to shipments at least once during the preceding 12-month period.  In connection with its efforts to market its November 2017 initial public offering, the Company emphasized that its active client base had grown dramatically from 867,000 at August 1, 2015 to 1.674 million at July 30, 2016, to 2.194 million at July 29, 2017, representing year-over-year growth rates of 93.1% and 31.1%, respectively.  Stitch Fix focused investors on the growth of its active clients, stating that "the number of active clients [was] a *key indicator of [its] growth and the overall health of [its] business*."

5.       Stitch Fix's dramatic active client growth during 2017 and 2018, which served as a proxy for its revenue and profit growth during those same periods, was due in large part to its prolific television advertising campaign.  Although the Company was founded in 2011, its first television advertising campaign did not launch until 2017.

6.       Throughout the Class Period, Stitch Fix made materially false and/or misleading statements regarding the strength of its active client growth, its continued investment in television advertising, and its impact on the Company's financial prospects, which set investor growth expectations far higher than what the Company was actually experiencing.  For example, Stitch Fix materially misrepresented the strength of its sales growth prospects by concealing that its active client growth rate had plummeted from 8% in the third quarter of 2018 to 2% in the fourth quarter of 2018 and claiming, *inter alia*, that its strong third quarter results demonstrated

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

its business cycle's continued positive momentum while failing to disclose that the historical rates of growth reported in the Company's financial statements and reports to investors had actually slowed dramatically. Stitch Fix's active client rate had in fact decreased substantially by the time the Company reported its third quarter 2018 financial results on June 7, 2018—already a third of the way through the fourth quarter, which would end July 28, 2018. The Company also misstated its commitment to its television advertising for 10 of the 13 weeks in the fourth quarter, further negatively impacting new client additions.

7.  On June 7, 2018, the Company reported its financial results, touting a 30% year-over-year active client growth for the third quarter. Katrina Lake, Stitch Fix's Chief Executive Officer ("CEO"), stated that the Company "*continue[d] to balance growth* and profitability, [as] demonstrated by [its] *ability to consistently deliver top-line growth*," and that its strong third quarter "results demonstrate[d] *continued positive momentum* for Stitch Fix." Stitch Fix's shareholder letter issued the same day confirmed that, as to ongoing advertising efforts, including its television campaigns, it would "continue to make strategic and measured marketing investments designed to achieve near-term payback." And in its quarterly report on Form 10-Q filed with the SEC that same day, Stitch Fix expressly stated that it then "expect[ed] to increase [its] spending on" its television advertising campaigns. The market was elated, and the price of Stitch Fix common stock surged more than $5 per share on June 8, 2018, trading as high as $25.38 per share in intraday trading on unusually high volume of more than 12.6 million shares traded. The prices of Stitch Fix put option contracts were correspondingly affected.

8.  On June 19, 2018, CNBC published an article discussing Stitch Fix's earnings for the third quarter of 2018 titled, "Trader: this company could be the Netflix of apparel." The article emphasized the Company's reported 30% year-over-year subscriber growth:

**Trader: this company could be the "Netflix of apparel"**

- Josh Brown, Ritholtz Wealth Management CEO, bough Stitch Fix.

- It "might be the answer" to apparel companies that have had trouble building their online businesses, he said on Monday's "Halftime Report."

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

\*       \*       \*

***Brown also likes the fundamentals of the company.  He noted that it is "growing its user base by an outstanding number" and that it's also showing accelerating revenue*** . . . .

Stitch Fix went public on November 17, 2017, and shares are up 81% since through Monday's close.  ***The company most recently reported quarterly results on June 7 that topped analyst estimates for both earnings and revenue, and the number of subscribers grew 30% in Q3 compared to a year earlier.  The stock has soared 33% since the company announced results.***

As the market continued to digest the impact of the Company's reported third quarter 2018 growth and the continuing momentum that it purported to represent, the Company's share price increased to a Class Period high of $51.19 per share on September 17, 2018.

9.      Then, on October 1, 2018, after the close of trading, Stitch Fix reported its fourth quarter 2018 financial results, which fell short of projected active client growth expectations, disclosing that the Company had signed up far fewer than expected new active clients during that quarter, which had ended on July 28, 2018—more than two months earlier.  The Company shocked the market by disclosing that Stitch Fix's active client count was virtually flat, coming in at 2.7 million.  Indeed, its active client growth had plummeted by 70% quarter-over-quarter, falling from 180,000 new additions in the third quarter to just 54,000 in the fourth quarter—lower than any prior reported quarterly growth since it had first launched its television advertising campaigns in 2017—and well below the 120,000 active clients added during the fourth quarter of 2017.

10.      On Tuesday, October 2, 2018, the price of Stitch Fix stock declined $15.60 per share—***more than 35%***—on unusually high volume of more than 39.9 million shares traded, or more than 9.5 times the average daily volume over the preceding ten trading days.  The price of Stitch Fix put options was correspondingly affected.  By the close of trading that day, more than $600 million in market capitalization had simply vanished.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## JURISDICTION AND VENUE

11.     This action arises under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a)), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

12.     This Court has jurisdiction over this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

13.     Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b), as certain of the acts and conduct complained of herein, including the dissemination and/or omission of materially false and/or misleading information to the investing public, occurred in this District.

14.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the mails, interstate telephone communications, the Internet, and the facilities of the national securities markets.

## THE PARTIES

### A.     Plaintiff

15.     Plaintiff Ronald G. Bishop, Sr., as set forth in the accompanying certification filed herewith, sold Stitch Fix put options during the Class Period and suffered damages thereby.

### B.     Defendants

16.     Defendant Stitch Fix is incorporated in Delaware and has its principal executive offices located at 1 Montgomery Street, Suite 1500, San Francisco, CA 94104.  Stitch Fix is an online fashion subscription service.   During the Class Period, Stitch Fix's stock traded on the NASDAQ under the ticker symbol "SFIX."

17.     Defendant Katrina Lake ("Lake") is, and was at all relevant times, the Company's founder, CEO, and a director.

18.     Defendant Paul Yee ("Yee") is, and was at all relevant times, the Company's Chief Financial Officer.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

19.     Defendant Mike C. Smith ("Smith") is, and was at all relevant times, the Company's Chief Operating Officer.

20.     Defendants Lake, Yee, and Smith are referred to herein, collectively, as the "Individual Defendants."

21.     Stitch Fix and the Individual Defendants are referred to herein as the "Defendants."

**FALSE AND MISLEADING CLASS PERIOD STATEMENTS**

22.     The Class Period starts on June 8, 2018.  After the close of trading on June 7, 2018, Stitch Fix issued a press release and a letter to shareholders ("Q3 2018 Shareholder Letter") announcing its third quarter 2018 ("3Q18") financial results, stating in relevant part:

**Stitch Fix Announces Third Quarter Fiscal 2018 Financial Results**

Stitch Fix, Inc. (NASDAQ:SFIX), the leading online personal styling service, has released its financial results for its third quarter of fiscal year 2018 ended April 28, 2018 and posted a letter to its shareholders on its investor relations website. Highlights include delivering:

- Active clients of 2.7 million, an increase of 30% year over year
- Net revenue of $316.7 million, an increase of 29% year over year
- Net income of $9.5 million and adjusted EBITDA of $12.4 million
- Diluted earnings per share of $0.09

"In addition to driving strong net revenue, net income, and adjusted EBITDA, *we grew our active client count to 2.7 million, an increase of 30% year-over-year*," said Stitch Fix founder and CEO Katrina Lake.  "*We continue to balance growth and profitability, demonstrated by our ability to consistently deliver top-line growth* of over 20% even as we invest in category expansions, technology talent, and marketing.  *Our third quarter results demonstrate continued positive momentum* for Stitch Fix and the power of our unique ability to deliver personalized service at scale."

Today Stitch Fix also announced the upcoming launch of Stitch Fix Kids.

"Our new Stitch Fix Kids offering is a testament to the scalability of our platform," explained Lake. "We're excited for Stitch Fix to style everyone in the family and to create an effortless way for parents to shop for themselves and their children."

23.     The Q3 2018 Shareholder Letter, which was posted on the Company's website and filed with the SEC, repeated Stitch Fix's claim that it had "[grown] active clients to 2.7 million as of

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

April 28, 2018," from 2.5 million in 2Q18, and from 2.07 million in 3Q17, an increase of 614,000 and 29.6% year-over-year growth.  *See* Shareholder Letter at 3, 6.

24.     With respect to "Advertising," the Q3 2018 Shareholder Letter stated that Stitch Fix's "Q3'18 advertising spend," which it said included "the costs associated with the production of advertising, ***television***, radio and online advertising," had "increased relative to [its] Q3'17 expense [to] 8.7% of net revenue."  *Id.* at 7 & n.5.  The Q3 2018 Shareholder Letter also stated that the Company "***continue[s] to make strategic and measured marketing investments designed to achieve near-term payback***."  *Id.* at 7.

25.     Later that afternoon, Stitch Fix conducted a conference call with investors hosted by Lake, Yee, and Smith.  During the call, they provided additional positive commentary about the Company's third quarter 2018 financial results and the purportedly ongoing strength of its business metrics and financial prospects.  Defendant Lake reiterated that Stitch Fix had grown its "active client account to 2.7 million as of April 28, 2018, ***an increase of 614,000 and 30% year-over-year***," and that "Q3 also marks the fifth consecutive quarter of over 20% year-over-year topline growth."  Conference Call, Bloomberg (June 7, 2018).  She went on to emphasize that Stitch Fix had "***significant opportunities to acquire new clients in [its] existing business***," and that the "***30% year-over-year growth [it had] seen in active client count [was] the result of [efforts to serve new client groups], efficiently leveraging [its] performance marketing capabilities and increasing [its] brand awareness***."  *Id.*

26.     During the Q&A portion of the call on the impact that the new Men's and Plus-sized client offerings was having on the growth of active clients, defendant Lake emphasized that for "Plus, directionally," there were "75,000 . . . people that were waiting on the waitlist before [they] even launched the business," and though she stated Stitch Fix "[would not] be providing the exact numbers, the number of people that [were] benefiting from that service [was] significantly higher than that and ***certainly continue[d] to grow***."  She also emphasized that "from a category perspective, Men's [and] Plus size . . . are all great opportunities for us to be able to have ***many, many paths for long-term growth***."

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

27.     Asked which categories of active clients were providing Stitch Fix with the confidence to provide the strong 4Q18 financial guidance announced that day, defendant Yee responded that, "***from a driver's standpoint, we grew active clients by 30% year-over-year***, and that's both for our Women's and Men's categories," adding that the Company was "really pleased with efficiencies . . . seen with [its] ***marketing spend to attract new clients as well as ability to reengage and engage clients*** with the various tools . . . to really please [its] clients."

28.     On the same day, after the Company reported its financial results, CNBC aired a segment and published an article repeating Lake's claims of continuing positive momentum in scaling the Company's business:

> Stitch Fix soared after the company reported strong earnings and user growth on Thursday.
>
> Here's how the company did compared to what Wall Street expected:
>
> • Earnings: 9 cents vs. 3 cents forecast by Thomson Reuters
>
> • Revenue: $316.7 million vs. $306 million forecast by Thomson Reuters
>
> • Active clients: 2.7 million vs. 2.66 million forecast by StreetAccount
>
> In the year-ago quarter, Stitch Fix reported a loss per share of 38 cents on $245.1 million in revenue.
>
> *        *        *
>
> Founder and CEO Katrina Lake said the company has been able to post revenue growth without sacrificing investment in the business.
>
> "***Our third quarter results demonstrate continued positive momentum for Stitch Fix*** and the power of our unique ability to deliver personalized service at scale," Lake said in a statement.

29.     After the Company's positive statements in its 3Q18 report and conference call, the price of Stitch Fix common stock ***surged more than 26%***, or $5.71 per share, to trade as high as $25.38 per share in intraday trading on June 8, 2018, on unusually high volume.  The price of Stitch Fix put option contracts was correspondingly affected.

30.     On June 8, 2018, Stitch Fix filed its 3Q18 quarterly report on Form 10-Q with the

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

SEC, which was signed and certified pursuant to the Sarbanes-Oxley Act of 2002 by defendants Lake and Yee.  The Management's Discussion and Analysis ("MD&A") section of the Form 10-Q contained the following discussion of Stitch Fix's active client growth, which the Form 10-Q emphasized was a "key indicator of growth and the overall health of [the Company's] business," stating in pertinent part as follows:

### Active Clients

*We believe that the number of active clients is a key indicator of our growth and the overall health of our business.*  We define an active client as a client who checked out a Fix in the preceding 12-month period, measured as of the last date of that period.  A client checks out a Fix when she indicates what items she is keeping through our mobile application or on our website.  *We had 2,688,000 and 2,074,000 active clients as of April 28, 2018 and April 29, 2017, respectively, representing year-over-year growth of 29.6%.*

31.    Detailing the "Factors Affecting [its] Performance," the MD&A section of Stitch Fix's 3Q18 Form 10-Q further emphasized the Company's ongoing active customer growth success and how its marketing spend was contributing to that growth, stating in pertinent part as follows:

### Client Acquisition and Engagement

To grow our business, we must continue to acquire clients and successfully engage them.  We believe that implementing broad-based marketing strategies that increase our brand awareness has the potential to strengthen Stitch Fix as a national consumer brand, *help us acquire new clients* and drive revenue growth.  As our business has achieved a greater scale and we are able to support a large and growing client base, *we have increased our investments in marketing to take advantage of more marketing channels to profitably acquire clients*.  For example, *we recently significantly increased our advertising spend, from $21.3 million and $46.8 million for the three and nine months ended April 29, 2017 to $25.2 million and $73.2 million for the three and nine months ended April 28, 2018, respectively, to support the growth of our business.  We expect to continue to make significant marketing investments to grow our business*.  We currently utilize both digital and offline channels to attract new visitors to our website or mobile app and subsequently convert them into clients.  *Our current marketing efforts include* client referrals, affiliate programs, partnerships, display advertising, *television*, print, radio, video, content, direct mail, social media, email, mobile "push" communications, search engine optimization and keyword search campaigns.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

32.     Discussing the Company's revenue growth in 3Q18, the MD&A section of the Form 10-Q stated that "[r]evenue increased by $71.7 million and $189.4 million, or 29.2% and 26.3% during the three and nine months ended April 28, 2018 compared with the same periods last year," noting "[t]he increase in revenue was primarily attributable to a 29.6% increase in active clients from April 29, 2017 to April 28, 2018, which drove increased sales of merchandise."

33.     Elsewhere, the 3Q18 Form 10-Q emphasized the importance of the television advertising campaigns to Stitch Fix's sales and promotional efforts, stating that because its "continued growth depend[ed] on attracting new clients," "[s]tarting in calendar year 2017, [it] began to increase [its] paid marketing expenses by investing more in digital marketing and launching [its] first television advertising campaigns." The Form 10-Q also expressly stated that the Company then "expect[ed] to increase [its] spending on these and other paid marketing channels in the future."

34.     On June 19, 2018, CNBC published another article discussing the Company's 3Q18 earnings report titled "Trader: this company could be the Netflix of apparel." The article emphasized the Company's reported 30% year-over-year subscriber growth:

**Trader: this company could be the "Netflix of apparel"**

- Josh Brown, Ritholtz Wealth Management CEO, bought Stitch Fix.

- It "might be the answer" to apparel companies that have had trouble building their online businesses, he said on Monday's "Halftime Report"

- ***The company topped Q3 analyst estimates when it reported earnings on June 7, and noted that active clients grew 30% compared to a year earlier***.

     On Monday Ritholtz Wealth Management CEO and "Halftime Report" trader Josh Brown bought Stitch Fix since he believes it could become the "Netflix of apparel."

     The San Francisco-based company is a clothing subscription service. Users fill out a style profile online and then receive a package with personally-curated clothing and accessories from the company. Subscribers can decide what they would like to buy from the box, and they can return the remaining items free of charge.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1

> As e-commerce growth accelerates and traditional retailers struggle to keep up, Brown believes Stitch Fix could be a bright spot in the sector.

2

3

> "If you look at the trouble the apparel companies have had building an online business fast enough to offset the decline in foot traffic Stitch Fix might be an answer," he said on Monday's "Halftime Report." "It may become the Netflix of apparel."

4

5

> ***Brown also likes the fundamentals of the company. He noted that it is "growing its user base by an outstanding number" and that it's also showing accelerating revenue. "I think they found a way to build a business in apparel online that just absolutely delights their customers,"*** he said.

6

7

> Stitch Fix went public on November 17, 2017, and shares are up 81% since through Monday's close. ***The company most recently reported quarterly results on June 7 that topped analyst estimates for both earnings and revenue, and the number of subscribers grew 30% in Q3 compared to a year earlier. The stock has soared 33% since the company announced results***.

8

9

10 As the market continued to digest the impact of the Company's reported 3Q18 growth and the

11 continuing momentum that it purported to represent, the price of the Company's stock increased

12 to a Class Period high of $51.19 per share on September 17, 2018. The price of Stitch Fix put

13 option contracts was correspondingly affected.

14      35.     On July 15, 2018, defendant Lake presented for Stitch Fix on NBC's *Today* show.

15 A video link to the segment remained on the Company's website throughout the Class Period.

16 Lake explained how she had launched Stitch Fix with just 29 customers, with NBC digitally

17 displaying the number rapidly growing to 2.7 million active clients. As a result, it was stated that

18 Stitch Fix was then "worth about two billion dollars." Asked whether business had been

19 negatively impacted by the new Amazon.com Prime Wardrobe service rolled out earlier in 2018,

20 which similarly "ship[s] customers clothes to try before they buy," Lake claimed that it had not

21 impacted the business, emphasizing that "[t]he hardest part is that there's a million pairs of jeans

22 out there literally and which ones are going to be the best ones for your body. And that's

23 actually the hardest part to solve and we don't see anybody else doing that."

24      36.     Each of defendants' statements set forth in ¶¶22-28 and 30-35 were materially

25 false and misleading when made because they misrepresented and/or omitted material facts

26

27

28

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

necessary to make the statements made not misleading.  These material facts, which were known to or deliberately disregarded by each of the defendants, were:

(a) that Stitch Fix's active client growth had slowed to a crawl;

(b) that Stitch Fix had completely shut down its television advertising campaign for 10 of the 13 weeks in 4Q18, dramatically decreasing the number of new active client additions; and

(c) that as a result, the Company's current business metrics and financial prospects were not as strong as it had led the market to believe during the Class Period.

37.     On October 1, 2018, after the close of trading, Stitch Fix issued a press release announcing its financial results for 4Q18, the period ended July 28, 2018.  In the press release, the Company reported 2.7 million active clients, disclosing that its new active client growth had stalled throughout 4Q18.  The press release stated as follows:

**Stitch Fix Announces Fourth Quarter and Full Fiscal Year 2018 Financial Results**

. . . Stitch Fix, Inc. (NASDAQ:SFIX), the leading online personal styling service, has released its financial results for the fourth quarter and full fiscal year 2018 ended July 28, 2018 and posted a letter to its shareholders on its investor relations website.

**Fourth quarter highlights**

•       Active clients of 2.7 million, an increase of 25% year over year

•       Net revenue of $318.3 million, an increase of 23% year over year

•       Net income of $18.3 million and adjusted EBITDA of $11.1 million

•       Diluted earnings per share of $0.18

**Full year highlights**

•       Net revenue of $1.2 billion, an increase of 26% year over year

•       Net income of $44.9 million and adjusted EBITDA of $53.6 million

•       Diluted earnings per share of $0.34

"Q4 was another strong quarter for us," said Stitch Fix Founder and CEO, Katrina Lake. "We grew our active client count 25% year over year and delivered $318.3 million in net revenue and $11.1 million in adjusted EBITDA."

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

38.     During the conference call held with investors later that evening, Stitch Fix conceded that despite having reported on June 7, 2018—only three weeks before the end of 4Q18—that it had grown active clients by 180,000 quarter-over-quarter and 29.6% year-over-year—to 2.7 million—its active client growth rate had already dramatically declined and it was only up 54,000 quarter-over-quarter and 548,000, or 25%, year-over-year, and that its active client count still remained at 2.7 million.  Also during the call, which was hosted by defendants Lake, Yee and Smith, defendant Smith disclosed that, unbeknownst to investors, Stitch Fix had decided to "temporarily cease[] [its] national TV campaign for 10 weeks" during the 13 weeks of 4Q18, purportedly to "measure channel efficacy."  Defendant Smith conceded that the decision had a negative impact on new client growth during the quarter, acknowledging that defendants had "learned that TVE was a more effective acquisition channel than [they] had previously modeled as measured on a cost per acquisition basis."  During the Q&A session, when asked whether television advertising had "already turned back on," defendant Lake replied that Stitch Fix had "turned TV back on," expressly acknowledging that "TV is an important part of that portfolio."  Later she reiterated that "we always knew that TV was an important component of [marketing], but I think having gone through this test and having really understood more granularly how TV impacts, I think, we feel like it's a really important part of the portfolio and you'll continue to see us invest there."

39.     Later that evening, as the after-hours price of the Company's common stock began plummeting, *The Wall Street Journal* published an article on Stitch Fix.  According to the article, "[w]hen Stitch Fix, a subscription fashion service, had its initial public offering last November, investors were skeptical.  How many people would continue to pay for constant wardrobe updates?"  The article noted that while "[i]n its first quarters as a public company, Stitch Fix defied the skeptics and posted consistent growth, raising hopes that it could succeed where other subscription services ha[d] failed" and causing its stock price to increase by "73% through Monday's close," the "fiscal fourth-quarter results show[ed] that the bullish thesis may be ***coming apart at the seams***."  The article concluded that "***Stitch Fix's stagnation with its core***

*customer – American women – is a red flag*.  If it misses again, investors will have good reason to believe it is going the way of Blue Apron Holdings, Birchbox, and other subscription services that *soared and then lost their novelty*."

40.     On October 2, 2018, William Blair discussed the sharp deceleration in the growth of active clients and the Company's lower than expected 2019 revenue and earnings guidance:

**Greater-Than-Expected Deceleration of Active Clients Overshadows Plans to Launch Internationally**

What You Need to Know

- Active clients grew about 25% year-over-year to roughly 2.7 million. Sequential net adds of roughly 54,000 was lower than the Street estimate of roughly 128,000.

- Revenue slightly missed the Street estimate by less than 1%. Gross profit and EBITDA beat the Street by 2% and 13%, respectively.

- First quarter 2019 guidance was issued below the Street for both revenue and EBITDA.

- Initial fiscal 2019 guidance bracketed the Street for revenue and was below the Street for EBITDA. . . .

- The company announced plans to launch Women's and Men's offerings in the United Kingdom by the end of fiscal 2019.

    Stock Thoughts. *Stitch Fix shares are down about 20% in the aftermarket, likely due to greater-than-expected deceleration on active clients and revenue, as well as lower-than expected EBITDA guidance for fiscal 2019*.

41.     Following the Company's October 1, 2018 disclosures, the price of Stitch Fix common stock plummeted, falling $15.69 per share—*more than 35%*—on unusually high volume of more than 39.9 million shares traded, or *more than 9.5 times* the average daily volume over the preceding ten trading days.  The price of Stitch Fix put option contracts was correspondingly affected.

## CLASS ACTION ALLEGATIONS

42.     Plaintiff brings this action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of himself and all persons and entities who purchased publicly traded

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Stitch Fix common stock and/or sold put option contracts during the Class Period, and were damaged thereby, seeking to pursue remedies under the Exchange Act.

43.    Excluded from the Class are the Defendants named herein, members of their immediate families, any firm, trust, partnership, corporation, officer, director, or other individual or entity in which a Defendant has a controlling interest or which is related to or affiliated with any of the Defendants, and the legal representatives, heirs, successors-in-interest or assigns of such excluded persons.

44.    The members of the Class are so numerous that joinder of all members is impracticable.  During the Class Period, Stitch Fix Class A common stock was actively traded on the NASDAQ, which is an efficient market.  While the exact number of Class members cannot be determined at this early stage, Plaintiff believes that thousands of people held Stitch Fix Class A common stock during the Class Period.  Record owners and other members of the Class may be identified from records maintained by Stitch Fix or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

45.    Plaintiff's claims are typical of the claims of the Class because Plaintiff and all members of the Class were similarly affected by Defendants' unlawful conduct as complained of herein.

46.    Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel competent and experienced in class actions and securities litigation.  Plaintiff has no interests that are contrary to or in conflict with those of the Class.

47.    Common questions of law and fact exist as to all members of the Class, and predominate over any questions solely affecting individual members of the Class, and predominate over any questions solely affecting individual members of the Class.  The questions of law and fact common to the Class include, *inter alia*:

a)    Whether the federal securities laws were violated by Defendants' acts as alleged herein;

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

b)  Whether Defendants' publicly disseminated statement made during the Class Period contained untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

c)  Whether and to what extent Defendants' material untrue statements and/or omissions of material fact impacted the market price of Stitch Fix's publicly traded common stock and/or put option contracts during the Class Period;

d)  Whether Defendant acted with the requisite level of scienter in omitting and/or misrepresenting material facts;

e)  Whether the Individual Defendants were controlling persons of Stitch Fix;

f)  Whether reliance may be presumed pursuant to the fraud-on-the-market doctrine; and

g)  Whether Class members have sustained damages, and if so, the proper measure of damages.

48.  Plaintiff knows of no difficulty that will be encountered in the management of this action that would preclude its maintenance as a class action.

49.  A class action is superior to all other available methods for the fair and efficient adjudication of this action because, among other things, joinder of all members of the Class is impracticable.  In addition, since the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation would make it nearly impossible for members of the Class to bring individual actions.

**LOSS CAUSATION**

50.  Defendants' wrongful conduct, as alleged herein, directly and proximately caused Plaintiff and the Class to suffer substantial damages.

51.  During the Class Period, Plaintiff and other Class members purchased publicly traded Stitch Fix common stock and/or sold put option contracts and suffered substantial losses

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

and damages when the true facts concealed by Defendants' fraud were revealed and/or when the risks concealed by those undisclosed facts materialized.

### *RESPONDEAT SUPERIOR* AND AGENCY PRINCIPLES APPLY

52.     Stitch Fix is liable for the acts of the Individual Defendants and other Company officers, directors, employees, and agents under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment or agency with the authority or apparent authority to do so.

53.     The scienter of the Individual Defendants and other Company officers, directors, employees, and agents is similarly imputed to Stitch Fix under *respondeat superior* and agency principles.

### CONTROL PERSON LIABILITY

54.     The Individual Defendants, because of their positions with Stitch Fix, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers, and institutional investors.  Each of the Individual Defendants had a duty to promptly disseminate complete, accurate, and truthful information with respect to Stitch Fix's business and financial condition. Each of the Individual Defendants was provided with copies of the Company's SEC filings, reports, and press releases alleged herein to be false or misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information, each of the Individual Defendants knew that the adverse facts and omissions specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations and omissions which were being made were then materially false and/or misleading.

### THE FRAUD ON THE MARKET PRESUMPTION

55.     The false and/or misleading statements alleged herein were material and public and, at all relevant times, the market for Stitch Fix's publicly traded common stock and put option contracts was an efficient market for the following reasons, among others:

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

a) Stitch Fix's Class A common stock was listed on the NASDAQ, a highly efficient market;

b) As a registered and regulated issuer of securities, Stitch Fix filed periodic reports with the SEC, in addition to the frequent voluntary dissemination of information;

c) Stitch Fix regularly communicated with public investors through established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures such as communications with the financial press and other similar reporting services;

d) The market reacted to public information disseminated by Stitch Fix; and

e) Several analysts followed Stitch Fix's business and wrote reports which were publicly available and affected the market place.[2]

56.     As a result of the above, the market for Stitch Fix's publicly traded common stock and put option contracts promptly digested current information with respect to the Company from all publicly available sources and reflected such information in the market prices.  The historical daily trading prices and volumes of Stitch Fix's securities are incorporated herein by reference.

57.     The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to overvalue Stitch Fix's publicly traded common stock and put option contracts during the Class Period.  Without knowledge of the misrepresented or omitted facts, Plaintiff and other members of the Class purchased publicly traded Stitch Fix common stock and/or sold put option contracts between the time that the Defendants made the material misrepresentations and omissions and the time that the truth was revealed, during which time the price of Stitch Fix's publicly traded common stock, to which the price of Stitch Fix's put option

---

[2]     *See* NASDAQ, *Analyst Firms Making Recommendations*, https://www.nasdaq.com/symbol/sfix/recommendations (last visited Dec. 10, 2018).

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

contracts is inherently linked, was artificially inflated by Defendants' misrepresentations and omissions.  Thus, a presumption of reliance applies.

**CAUSES OF ACTION**

**COUNT I**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants**

58.     Plaintiff re-alleges each allegation above as if fully set forth herein.

59.     This Count is brought under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5, against all Defendants.

60.     During the Class Period, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder by making the false and misleading statements specified herein, including the statements in SEC filings, press releases, and conference calls concerning Stitch Fix's business and financial condition, whose truth they knowingly or recklessly disregarded when they failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not false or misleading.

61.     The acts and scienter of the Individual Defendants and other Company employees are imputed to the Company under the principles of agency and *respondeat superior*.

62.     Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal non-public, adverse material information about the Company's operations and financial condition as reflected in the misrepresentations and omissions set forth above.

63.     Defendants each had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth by failing to ascertain and to disclose such facts even though such facts were available to them, or deliberately refrained from taking steps necessary to discover whether the material facts were false or misleading.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

64.    As a result of Defendants' dissemination of materially false and misleading information and their failure to disclose material facts, Plaintiff and the Class were misled into believing that the Company's statements and other disclosures were true, accurate, and complete.

65.    Plaintiff and other Class members purchased publicly traded Stitch Fix common stock and/or sold put option contracts, without knowing that Defendants had misstated or omitted material facts about the Company's operations and financial performance or prospects.  In doing so, Plaintiff and other Class members relied directly or indirectly on false and misleading statements made by Defendants, and/or an absence of material adverse information that was known to Defendants or recklessly disregarded by them but not disclosed in Defendants' public statements.

66.    Plaintiff and other Class members were damaged as a result of their reliance on the Defendants' false and/or misleading statements and misrepresentations and omissions of material facts.  Plaintiff and other Class members would not have purchased publicly traded Stitch Fix common stock and/or sold put option contracts at the prevailing prices had they known the truth about the matters discussed above.

67.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other Class members have suffered damages in connection with their purchases of Stitch Fix publicly traded common stock and/or sales of Stitch Fix put option contracts.

68.    Plaintiff is filing this action within two years after the discovery of the facts constituting the violation, including facts establishing scienter and other elements of Plaintiff's claims, and within five years after the violations with respect to Plaintiff's investments.

## COUNT II

**For Violations of Section 20(a) of the Exchange Act Against the Individual Defendants**

69.    Plaintiff re-alleges each allegation above as if fully set forth herein.

70.    This Count is asserted against the Individual Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), on behalf of all members of the Class.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

71.     As set forth in Count I, Stitch Fix committed a primary violation of Section 10(b) of the Exchange Act by knowingly and/or recklessly disseminating materially false and misleading statements and/or omissions throughout the Class Period.

72.     Each of the Individual Defendants, by reason of their status as senior executive officers and/or directors of Stitch Fix, directly or indirectly, controlled the conduct of the Company's business and its representations to Plaintiff and other Class members, within the meaning of Section 20(a) of the Exchange Act.  The Individual Defendants directly or indirectly controlled the content of the Company's SEC filings, press releases, and other statements related to Plaintiff's and other Class members' investments in publicly traded Stitch Fix common stock and/or put option contracts within the meaning of Section 20(a) of the Exchange Act.  Therefore, the Individual Defendants are jointly and severally liable for the Company's fraud, as alleged herein.

73.     The Individual Defendants controlled and had the authority to control the content of the Company's SEC filings, press releases, and other statements.  Because of their close involvement in the every-day activities of the Company, and because of their wide-ranging supervisory authority, the Individual Defendants reviewed or had the opportunity to review these documents prior to their issuance, or could have prevented their issuance or caused them to be corrected.

74.     The Individual Defendants knew or recklessly disregarded the fact that Stitch Fix's representations were materially false and misleading and/or omitted material facts when made.  In so doing, the Individual Defendants did not act in good faith.  By virtue of their high-level positions and their participation in and awareness of Stitch Fix's operations and public statements, the Individual Defendants were able to and did influence and control Stitch Fix's decision making, including controlling the content and dissemination of the documents that Plaintiff and other Class members content contained materially false and misleading information and on which Plaintiff and other Class members relied.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff on his own behalf, and on behalf of the Class, demands judgment against Defendants as follows:

A.   Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class Representative;

B.   Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and statements alleged herein;

C.   Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorney's fees, expert fees, and other costs;

D.   Awarding rescissory damages in favor of Plaintiff and the other Class members where appropriate against all Defendants, jointly and severally, for all injuries sustained as a result of Defendants' wrongdoing, in an amount to be determined at trial, including pre-judgment and post-judgment interest, as allowed by law; and

E.   Awarding such other and further relief as this Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury on all triable claims.

Dated: December 10, 2018            By: /s/ *Dillon Hagius*
                                            Dillon Hagius

Dillon Hagius (SBN 319632)
Richard W. Gonnello (*pro hac vice* forthcoming)
Katherine M. Lenahan (*pro hac vice* forthcoming)
**FARUQI & FARUQI, LLP**
685 Third Avenue, 26th Floor
New York, NY 10017
Telephone: 212-983-9330
Facsimile: 212-983-9331
Email: dhagius@faruqilaw.com
          rgonnello@faruqilaw.com
          klenahan@faruqilaw.com

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

*Attorneys for Plaintiff Ronald G. Bishop, Sr.*

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS